IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: | Case No. 18-10798 |
| W Resources, L.L.C. | Chapter 11 |
| *Debtor.* | |

## EX PARTE APPLICATION TO EMPLOY BEAU BOX COMMERCIAL REAL ESTATE, L.L.C. AS BROKERS AND CONSULTANTS FOR THE ESTATE UNDER § 327(a)

**NOW INTO COURT**, through undersigned counsel, comes the Debtor, W Resources, LLC ("Debtor") who moves for the entry of an Order authorizing and approving the employment of Beau Box Commercial Real Estate, L.L.C. ("BBCRE") as exclusive brokers for certain properties and as consultants for the estates. In support, the Debtor represents:

1.      Debtor filed a voluntary petition under chapter 11 of title 11, United States Code, on July 23, 2018 (the "Petition Date").  No trustee has been appointed and debtor functions as debtor-in-possession within the meaning of 11 U.S.C. § 1101(1).

2.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (M), and (O). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory basis for the relief requested herein is 11 U.S.C. §§ 105(a), 327, 328, 1107, and 1108, and FED. R. BANKR. P. 2014.

3.      The Debtor seeks approval pursuant to 11 U.S.C. § 327(a) to employ and retain BBCRE as its real estate broker and consultant in connection with this Chapter 11 case. Pursuant to 11 U.S.C. §§ 328(a), 330, and 331, the Debtor, as debtor-in-possession, requests that the Court approve the retention and compensation of BBCRE as its  real estate broker and consultant to

perform those marketing, sale and advisory services necessary in connection with liquidation of the Debtor's real property assets.

4.    On the Petition Date, the Debtors owned certain immovable property in East Baton Rouge and East Feliciana Parishes known as the (i) Bumble Bee, (ii) Eastwood and (iii) Treakle properties (the "Large Zachary Properties").[1] The Debtor additionally owns numerous other tracts of real property, both with and without improvements.  The Debtor wishes to employ BBCRE as its real estate broker and consultant to advise the Debtor regarding the marketing and disposition of real property assets under both a commission (for the Large Zachary Properties) and hourly-based (for all other real property) compensation structures further described below.

5.    The Debtor selected BBCRE as its real estate broker and consultant because of BBCRE's experience in the field of real estate. BBCRE has performed such engagements for various clientele throughout the state and is well versed in debt-distressed real estate transactions. The Debtor engaged BBCRE and its principal, Beau J. Box ("Beau Box"), who will work closely with the Debtor and its management to successfully liquidate the real property assets.

6.    Subject to further order of this Court, it is proposed that Debtor be permitted to retain BBCRE as its realtor and consultant as more fully stated in the engagement letter attached hereto as **Exhibit "1."** By way of a synopsis, the engagement letter provides that BBCRE be retained as Debtor's realtor and consultant to assist in the marketing and sale of its significant real estate assets. BBCRE's services shall consist of the following, if appropriate and requested by the Company:

    a.    Familiarizing itself with the Debtor's real estate holdings;
    b.    Assisting the Debtor in identifying, qualifying and managing potential purchasers;

---

[1]Property descriptions of the Large Zachary Properties can be found in § 1.2 of the BBCRE engagement letter attached to this motion as **Exhibit "1."**

c.  Take the lead in developing of all written marketing materials describing the Debtor's real property when requested, it being expressly understood that the Debtor will remain solely responsible for the accuracy and completeness of such documents and all of the information contained therein;

d.  Assisting the Debtor in preparing for and making presentations to potential purchasers;

e.  Assisting the Debtor in the maintenance of a third party online datasite, it being expressly understood that BBCRE shall have not liability to the Debtor or any other party with respect to the maintenance, security, or any other matter related to the use of such online datasite;

f.  Assisting the Debtor in soliciting, coordinating and evaluating indications of interest and proposals from potential purchasers;

g.  Assisting the Debtor in structuring and negotiating the terms of any purchase(s), including participating in negotiations with creditors and other parties involved in any sales, if necessary;

h.  Attending meetings of Debtor's creditor groups, official constituencies and other interested parties, as requested;

i.  Providing in court testimony regarding real estate matters as necessary; and

j.  Providing such other brokerage, consulting and advisory services as may be agreed upon in writing by the Debtor and BBCRE.

7.  As compensation for services rendered under this Agreement, the Debtor shall pay to BBCRE the following:

a.  *Brokerage Fee:* Upon the closing of the sale of the Large Zachary Property, or each individual property comprising the Large Zachary Property, BBCRE shall earn, and the Debtor shall thereupon pay at closing as a cost of such transaction, a cash fee ("Commission") equal to three percent (3.0%) of the gross sales price.

b.  *Consulting Fee*: For time expended on behalf of the Debtor in the nature of consulting services, expert witness services, or other services relating to the Debtor's real property other than the Large Zachary Property, BBCRE shall be compensated on an hourly basis ranging $250.00 for Beau Box, $150.00 for Burden Edmunds and $50.00 for analysts.

8.  The Debtor respectfully submits that the rates and charges set forth above are reasonable and should be approved under section 328(a) of the Bankruptcy Code, which specifically authorizes compensation of a professional person on a "fixed or percentage fee basis." 11 U.S.C. § 328(a). The compensation arrangements contained in the Engagement

Agreement are beneficial to the Debtor's estates as they provide certainty and proper inducement.

9.      BBCRE's fees and expenses will remain subject to Court approval, consistent with the proposed compensation set forth in the Engagement Agreement. Further, because the Debtor seeks to retain BBCRE under section 328(a) of the Bankruptcy Code, the Debtor believes that BBCRE's compensation should not be subject to any additional standard of review under § 330 of the Bankruptcy Code and should not constitute a "bonus" or fee enhancement under applicable law. Notwithstanding the foregoing, the Office of the United States Trustee (the "U.S. Trustee") shall retain the right to review the reasonableness of BBCRE's fees under the standard of section 330 of the Bankruptcy Code.

10.      The overall compensation structure described above is comparable to compensation generally charged by real estate brokers of similar stature to BBCRE for comparable engagements, both in and out of court.

11.      As set forth in the declaration of Beau J. Box, annexed hereto as **Exhibit "2"**, the Debtor has been informed and believe that BBCRE has no connection with the Debtors' creditors, any other party in interest or their respective attorneys and accountants, the U.S. Trustee or anyone employed in the United States Trustee's office. Upon information and belief, BBCRE is disinterested within the meaning of 11 U.S.C. § 101(14).

12.      BBCRE has not previously entered into any agreements with the Debtor.

**WHEREFORE**, the Debtor requests the *ex parte* entry of an Order authorizing the employment of BBCRE under the terms requested herein and for such other relief deemed just.

Respectfully Submitted,

**STEWART ROBBINS & BROWN LLC**
P. O. Box 2348
Baton Rouge, LA 70821-2348
(225) 231-9998 Telephone
(225) 709-9467 Fax

By:   /s/ *P. Douglas Stewart, Jr.*
**Paul Douglas Stewart, Jr. (La. #24661)**
dstewart@stewartrobbins.com
**William S. Robbins (La. #24627)**
wrobbins@stewartrobbins.com

*Interim Counsel to W Resources, LLC*

# EXHIBIT 1
# SERVICES AGREEMENT

EXCLUSIVE LISTING AGREEMENT
FOR SALE OF COMMERCIAL REAL ESTATE
WITH CONSULTING ADDENDUM

I. BASIC PROVISIONS.

1.1. Parties: Subject to entry of an Order of the Bankruptcy Court in the Chapter 11 Case (as those terms are defined below), this Listing Agreement ("Agreement") is made by and between: W Resources, LLC, Debtor and Debtor in Possession in that certain case ("the Chapter 11 Case") under Chapter 11 of Title 11, United States Code styled In re W Resources, LLC as Case No. 16-10798 on the docket of the United States Bankruptcy Court for the Middle District of Louisiana ("the Bankruptcy Court"), including successors and assigns ("Owner") and BEAU BOX COMMERCIAL REAL ESTATE, including its successors, assigns, and Designated Agent ("Broker").

1.2. Property: The real property, or a portion thereof, which is the subject of this Agreement ("Property") is commonly known as the (a) Bumble Bee, (b) Eastwood and (c) Treakle tracts, more particularly described as follows:

**Bumble Bee**

That certain lot or parcel of ground" together with all buildings and improvements thereon" located in the Parishes of East Baton Rouge and East Feliciana, State of Louisiana, and being more particularly described as BUMBLE BEE RANCH, containing 414.16 acres, as per "Plat Showing Boundary Survey of the Bumble Bee Ranch Located in Sections 5t, 52, T4S-R1W, GLD, East Feliciana Parish Louisiana and East Baton Rouge Parish, Louisiana for George B. Lormand, Jr." dated October 22,2007, prepared by Charles T. Snyder, Registered Professional Land Surveyor, which plat is attached hereto and made a part hereof.

**Eastwood**

That certain lot or parcel. of ground{ together with all buildings and improvements thereon, located in the Parish of East Baton Rouge, State of Louisian4 and being more particulate described as LOT B-2, EASTWOOD PLANTATION as per the plat Showing Boundary Survey of Lot B-2 Eastwood Plantation Located in Sections 51, 52, 6l &, 62, T4S-R1W, GLD City of Zachary East Baton Rouge Parish, Louisiana for Bryan Arbour & Willard Arbour" prepared by Charles T. Snyder, R.P.L.S., dated September 10, 2007, recorded in the official records of East Baton Rouge Parish" State of Louisiana. Said Lot B-2 containing 580.11 acres and having the dimensions and being subject to the servitudes and dedications as set forth on the official map.

and

LOT B-1 of Eastwood Plantation, containing 6.92 acres.

**Treakle**

One certain lot or parcel of ground, together with all buildings and improvements thereon, situated in the Parish of East Baton Rouge, State of Louisiana, in Sections 5 1, 61, 63 and 64, T4S, Rl W, Greensburg Land District of Louisiana and being more particularly described as a portion of the E.M. Treakle Subdivision of Sunnyside Plantation, according to a plat of survey made by Edward E. Evans and Associates, Inc., a copy of which is on file and of record with the Clerk and Recorder for the Parish of East Baton Rouge, and being described, according to said survey, as Lot Number Thirty Three-C-1 (33-C-1 ), said Sunnyside Plantation, said lot having such dimensions and being subject to such servitudes as are of record and as shown on said subdivision plat being recorded at Original 584 of Bundle 9303 of the official records of East Baton Rouge Parish, Louisiana.

and

Two certain tracts or parcels of ground, with all improvements thereon, and all rights, ways, and privileges

thereunto belonging or in anywise appertaining, located in the Parish of East Baton Rouge, Louisiana, and being shown as Lots 35-A and 35-B on a "Final Plat Showing the Resubdivision of Lots 1 -4, 8-A-l-4, 9, I 0-B-3, l5-C, 16-4, 17-A,24-I-A and 32-A of the 'E.M. Treakle Subdivision of Sunnyside Plantation' into Lots 35-A and 35-8, all located in Sections 51,61, and 63, T4S, RlW, Greensburg Land District, East Baton Rouge, Louisiana, for Chris Hicks", November 23, 1992, by A. D. Primeaux, P.L.S., a copy of which is on file and of record with the Clerk of Court for East Baton Rouge Parish, LA as Original 994 of Bundle 10362.

and

That certain piece or portion of ground, together¡ with ail buildings and improvements thereon, and all the rights, ways, privileges, servitudes, appurtenances and advantages thereunto belonging or in otherwise appertaining, situated in the parish of East Baton Rouge, State of Louisiana, and being designated as "Tract X', all according to a plat entitled "Map Showing Resubdivision of Lots 33-4, 33-8, 33-C & Tract "X", Located in Sections 6l &. 63, T4S-RI W Greensburg Land District, East Baton Rouge, Louisiana, for Plains Grove Plantation, Inc." by Edward E, Evans & Associates, Inc., dated June 17 , 1977, and recorded as Original 256 of Bundle 9204 of the official records of East Baton Rouge Parish, Louisiana.

1.3. **Term of Agreement:** The term of this Agreement ("Term") shall commence upon entry of an Order of the Bankruptcy Court approving this Agreement and will expire twenty-four (24) months thereafter unless sooner terminated as provided herein or in the Order of the Bankruptcy Court approving this Agreement.

1.4. **Transaction:** The nature of the transaction concerning the Property for which Agent is employed ("Transaction") is:

1.4.1. A sale or sales for such price(s) and on other such additional terms and conditions as may be set forth in any Agreement(s) to Purchase and Sell hereafter executed in connection with the sale of the Property or as may be otherwise agreeable to Owner, acting through its then duly authorized Manager, and approved by the Bankruptcy Court in the Chapter 11 Case.

2. <u>EXCLUSIVE EMPLOYMENT AND RIGHTS.</u>

2.1. Owner hereby employs Broker as Owner's sole and exclusive agent to represent Owner in the Transaction and to find purchasers, as the case may be, for the Property. Broker shall use reasonably diligent efforts to find such purchasers. All negotiations and discussions for a Transaction shall be conducted by Broker on behalf of Owner. Owner shall promptly disclose and refer to Broker all written or oral inquiries or contacts received by Owner, from any source, regarding a possible Transaction.

2.2. Owner authorizes Broker in its sole discretion to: (a) Place advertising signs on the Property; (b) Place a lock box on the Property if vacant; (c) Accept deposits from potential purchasers or tenants; and (d) Distribute information regarding the Property to participants in LACDB and any other appropriate multiple listing services, to other brokers, and to potential purchasers or tenants of the Property. Owner shall identify as "confidential" any information provided to Broker that Owner considers confidential and does not want disclosed. All other information provided by Owner may be disclosed as Broker may deem appropriate or necessary, and, after consummation of a Transaction, Broker is authorized to publicize the terms of such Transaction.

2.3. Owner agrees that Broker may, during the ordinary and normal course of marketing the Property, respond to inquiries on the Property by showing and providing information on the Property and other competing properties, to prospective purchasers and that such activities may result in the payment of a commission to Broker by a third party.

3. <u>PROPERTY.</u>

3.1. The term "Property" shall include all of the following which are currently located on the Property and

owned by Owner: permanent improvements, electrical distribution systems (power panels, buss ducting, conduits, disconnects, lighting fixtures, etc.), telephone distribution systems (lines, jacks and connections), space heaters, air conditioning equipment, air lines, carpets, window coverings, wall coverings, partitions, doors, suspended ceilings, built-ins such as cabinets, and the following additional items (if any): NONE. If the Transaction is a sale, the term "Property" shall include to the extent owned by Owner, oil and mineral rights, leases and other agreements that will continue in effect after Owner's transfer of title to the Property.

3.2.  Within five business days after the commencement of the Term hereof, Owner shall provide Broker with the following: (a) Copies of all leases, subleases, rental agreements, option rights, rights of first refusal, rights of first offer, or other documents containing any other limitations on Owner's right, ability and capacity to consummate a Transaction, and (b) If available to Owner, copies of building plans, and if the Transaction is a sale, title reports, boundary surveys, and existing notes and trust deeds which will continue to affect the Property after consummation of a sale.

3.3.  Broker shall have no responsibility to advance any funds or incur any liability whatsoever for maintenance, repair, replacement, operation, or security of the Property, all of which shall be Owner's sole responsibility. Unless caused by Broker's gross negligence, Broker shall not be liable for any loss, damage, or injury to the person or property of Owner, any tenants of the Property, any purchaser, prospective purchaser, tenant, or prospective tenant, including, but not limited to, those which may occur as a result of Broker's use of a lock box.

4.  <u>TERMINATION BEFORE EXPIRATION OF TERM.</u>

4.1.  Notwithstanding the Term hereof, this agreement may be terminated by Owner or the Bankruptcy Court, after Notice and an opportunity for hearing, for cause at any time during the term.  In the event of early termination, Broker shall only be entitled to a commission with respect to any sale or sale(s) as to which written agreements have been fully executed and actually close thereafter and which have been approved by the Bankruptcy Court either before or after termination, if the Chapter 11 Case remains pending and such approval is therefore necessary. Notwithstanding the foregoing, Broker may also be entitled to a commission or commissions after termination as provided in Section 7 below.

5.  <u>COMMISSION.</u>

5.1.  Owner shall pay Broker a commission ("Agreed Commission") in the amount of THREE PERCENT (3%) of the gross sales price for a sale or sales Transaction(s).  The commission for sale Transaction(s) shall be paid at the closing of such sale Transaction(s) after approval of such sale Transaction(s) by Order of the Bankruptcy Court in the Chapter 11 Case.

6.  <u>ALTERNATIVE TRANSACTION.</u>

6.1.  If the Transaction changes to any other transaction, including, but not limited to a sale, exchange, option to buy, right of first refusal, ground lease, lease, sublease or assignment of lease (collectively "Alternative Transaction"), then Broker shall automatically remain Owner's sole and exclusive Broker for such Alternative Transaction and represent Owner in such Alternative Transaction, under the terms and conditions of this Agreement. If, during the Term hereof, an Alternative Transaction is entered into, then Owner shall pay Broker the Agreed Commission.

7.  <u>REGISTERED PERSONS.</u>

7.1.  Broker shall, within five business days after the first to occur of (1) early termination hereof or (2) expiration of the Term hereof, provide Owner, in writing, with the name of those persons or entities with whom Broker either directly or through a Cooperating Broker had negotiated during the Term hereof ("Registered Persons"), and shall specify the type of transaction of the Property for which such negotiations were conducted ("Registered Transaction"). Those persons or entities that submitted offers or

letters of intent, however, are automatically deemed Registered Persons for the type of transaction that was the subject of such offer or letter of intent. The parties are aware that the registration of certain individuals and entities might create a Dual Agency, and Owner hereby consents to any such Dual Agency.

7.2. If, within one hundred-eighty days after the expiration of the Term hereof, Owner enters into a contract with a Registered Person for consummation of a Registered Transaction, then Owner shall, upon consummation of such Registered Transaction, pay Broker the Agreed Commission for the Registered Transaction.

7.3. If, within one hundred-eighty days after the expiration of the Term hereof, Owner enters into another owner-agency or listing agreement with an entity other than Broker for any transaction concerning the Property, then Owner shall provide to Owner's new broker the names of the Registered Persons and the Registered Transaction for each Registered Person, and provide in such new agreement that the new broker shall not be entitled to receive any of the compensation payable to Broker hereunder for consummation of a Registered Transaction with a Registered Person.

7.4. In order to qualify as a Registered Person, the individual or entity must have: toured the Property, submitted a letter of interest or intent, and/or made an offer to purchase the Property. In addition, Excluded Persons may only be registered by a broker who previously had a valid listing agreement covering the Property, and such broker may only register individuals and entities actually procured by such listing broker.

8. OWNER'S REPRESENTATIONS.

   8.1. NONE

9. OWNER'S ACKNOWLEDGMENTS.

   9.1. Owner acknowledges that Owner has been advised by Broker to consult and retain experts to advise and represent it concerning the legal and tax effects of this Agreement and consummation of a Transaction or Alternative Transaction, as well as the condition and/or legality of the Property, including, but not limited to, the Property's improvements, equipment, soil, tenancies, title and environmental aspects. Broker shall have no obligation to investigate any such matters unless expressly otherwise agreed to in writing by Owner and Broker. Owner further acknowledges that in determining the financial soundness of any prospective purchaser, tenant or security offered, Owner will rely solely upon Owner's own investigation, notwithstanding Broker's assistance in gathering such information, except to the extent that Broker may be acting in the capacity of Manager of Owner in agreeing to a transaction subject to approval of the Bankruptcy Court.

10. MISCELLANEOUS.

   10.1. This Agreement shall not be construed either for or against Owner or Broker, but shall be interpreted, construed and enforced in accordance with the mutual intent of the parties ascertainable from the language of this Agreement.

   10.2. All payments by Owner to Broker shall be made in lawful United States currency.

   10.3. In the event of litigation between Owner and Broker, arising under or relating to this Agreement or the Property, the losing party shall pay the Prevailing Party's attorney fees and costs. The term, "Prevailing Party" shall include, without limitation, one who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other party of its claim or defense. The attorney's fees award shall not be computed in accordance with any court fee schedule, but shall be in an amount to fully reimburse all attorney's fees reasonably incurred in good faith.

   10.4. Owner hereby releases and relieves Broker, and waives Owner's entire right of recovery against Broker,

for direct or consequential loss or damage arising out of claims for personal injury or property damage relating to this Agreement, unless due to the gross negligence of Broker.

10.5. Broker shall comply with all applicable anti-discrimination laws.  Broker further agrees to comply with all applicable federal, state, and local laws, regulations, codes, ordinances, and administrative orders having jurisdiction over the parties hereto, the Property or the subject matter of this Agreement, including but not limited to the 1964 Civil Rights Act and all amendments thereto, the Foreign Investment in Real Property Tax Act, the Comprehensive Environmental Response Compensation and Liability Act, the Americans with Disabilities Act, and any applicable state licensing and disclosure laws.

11.  <u>LITIGATION OF DISPUTES.</u>

11.1. ANY CONTROVERSY ARISING UNDER OR RELATING TO THIS AGREEMENT SHALL BE DETERMINED BY THE BANKRUPTCY COURT IN THE CHAPTER 11 CASE.

12.  <u>ADDITIONAL PROVISIONS.</u>

12.1. Additional provisions of this Agreement are set forth in the following blank lines or in an addendum attached hereto and made a part hereof (if there are no additional provisions write "NONE"):

Owner may also require real estate consulting and other real estate services unrelated to the Transaction(s) or Alternative Transaction(s) ("Nontransaction Services").  Broker agrees to provide Nontransaction Services as reasonably requested by Owner.  Subject to Bankruptcy Court approval, Broker shall be compensated on an hourly basis for Nontransaction Services, at the following rates:  (i) $250/hour for Nontransaction Services provided by Beau Box; (ii) $150/hour for Nontransaction Services provided by Burden Edwards; and (iii) $50/hour for Nontransaction Services provided by other analysts.  Owner has no obligation hereunder to utilize Broker for Nontransaction Services, and is free to utilize the services of any other broker or realtor for same.  Owner may terminate this Section 12.1 without affecting the other rights and obligations under this Agreement. Further, it is understood that Nontransaction Services shall not affect Broker's right to payment of its Agreed Commission related to any Transaction or Alternative Transaction.

Owner and Broker have executed this Agreement effective as of the date set forth below subject to approval of the Bankruptcy Court in the Chapter 11 Case.

OWNER:

W Resources, L.L.C.

_____
BY: Dwayne M. Murray, Manager

BROKER:

BEAU BOX COMMERCIAL REAL ESTATE

_____
Name: Beau J. Box, President

Date: _____

# EXHIBIT 2
# BEAU BOX STATEMENT

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: | Case No. 18-10798 |
| W Resources, L.L.C. | Chapter 11 |
| *Debtor.* | |

**VERIFIED STATEMENT OF BEAU BOX PURSUANT TO BANKRUPTCY
CODE §§328(A), 329 AND 504, AND BANKRUPTCY RULES 2014(A) AND 2016(B)**

Beau J. Box hereby states under penalty of perjury:

1.     I am a member of Beau Box Commercial Real Estate, L.L.C. ("BBCRE"), and I am an experienced realtor with more than 20 years of experience in real estate brokerage and consulting.  BBCRE's office is located in Baton Rouge, Louisiana.

2.     In order to determine BBCRE's connections with W Resources LLC (the "Debtor"), creditors, parties-in-interest, their respective attorneys and accountants in the Debtor's case, the United States Trustee, and persons employed in the office of the United States Trustee (the "Relevant Entities"), I conducted a conflicts check.

3.     Following that check, I am able to state, to the best of my knowledge the following statements with regard to BBCRE and its professionals are true.

4.     To the best of the my knowledge, information and belief:

    a.   Neither BBCRE nor I have a connection with the captioned Debtor (other than as set forth herein), creditors of the Debtor, the U.S. Trustee, any person employed in the office of the U.S. Trustee or any other party with an actual or potential interest in the Chapter 11 cases or its respective attorneys or accountants.

    b.   Neither BBCRE nor I are creditors.

    c.   Neither BBCRE nor I are an equity security holder of the Debtor.

     d.  Neither BBCRE nor I are insiders of the Debtor.

     e.  I nor BBCRE are Debtor's directors, officers, persons in control, partners or relatives of such.

     f.  And, neither BBCRE nor I hold nor represent an interest adverse to the Debtor, its estate or any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with or interest in the Debtor, or for any other reason.

5.     Neither BBCRE nor any of its professionals has ever represented a professional employed in the Debtor's bankruptcy case.

6.     BBCRE or one or more of its professionals may have represented, from time to time, entities who may have been or are creditors of, customers of, or vendors to the Debtor in the past. Neither BBCRE nor any of its attorneys will represent any such entities in connection with the Debtor's bankruptcy cases.

7.     Neither BBCRE nor any of its professionals have represented entities in this case which are adverse to the Debtor in this case.

8.     Neither BBCRE nor any of its professionals have any connection, to the best of its knowledge, with persons employed in any office of the United States Trustee.

9.     None of BBCRE's professionals are a relative of nor do they have any connections with judges of the Court to which this case is assigned.

10.     BBCRE does not have an interest materially adverse to the interests of the Debtor, their estates, or any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtor or an investment banker of any security of the Debtor or for any other reason.

11.   Any expenses will be applied for as compensation under §§ 327 and 330.

12.   I have read the Application to Employ BBCRE and the statements made therein

are true and correct to the best of my knowledge, information and belief, this September 6, 2018.

**/s/ Beau J. Box**
Beau J. Box